# Exhibit A

**SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| AMANDA FUISZ<br>4636 Kenmore Drive NW<br>Washington, DC 20007<br><br>Plaintiff,<br><br>v.<br><br>DATADOG, INC.<br>620 8th Avenue, 45th Floor<br>New York, NY 10018<br><br>Defendants, | Case No. 2024-CAB-002539<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**
(Employment Discrimination and Retaliation)

**INTRODUCTION**

On May 23, 2023, Defendant Datadog, Inc., terminated Plaintiff Amanda Fuisz's employment because she has a disability and complained about disability-based discrimination. Ms. Fuisz's supervisor, General Counsel Kerry Acocella, had a history of discriminating against employees with disabilities. Just days before she terminated Ms. Fuisz's employment, Ms. Acocella berated and belittled Ms. Fuisz for using charts and graphs to present information – tools that Ms. Acocella knew Ms. Fuisz needed because of her ADHD. Ms. Fuisz brings this claim to recover damages for wrongful termination and retaliation in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1402.01 *et seq.* (the "DCHRA").

**PARTIES**

1. Plaintiff Amanda Koenig Fuisz is a resident of the District of Columbia. At all times relevant to this Complaint, Ms. Fuisz was Defendant's employee within the meaning of and

entitled to the protections of the DCHRA, and she worked primarily from her home in the District of Columbia

2. Defendant Datadog, Inc., is a New York company that, at all relevant times, was Ms. Fuisz's employer within the meaning of and subject to the requirements of the DCHRA.

## JURISDICTION AND VENUE

3. This Court has personal jurisdiction over Defendant as it employed Ms. Fuisz to work remotely from the District of Columbia, and Defendant otherwise conducts business there.

4. This Court has subject matter jurisdiction over this matter as the claims arise under the DCHRA and the discriminatory and tortious conduct occurred in Washington, D.C.

5. Venue is proper in this Court because a substantial portion of the events giving rise to this claim took place in the District of Columbia and Ms. Fuisz's claims arise under District of Columbia law.

## FACTS

***Defendant hired Ms. Fuisz and quickly promoted her due to her excellent performance.***

6. Defendant hired Ms. Fuisz as a Senior Counsel on December 7, 2020.

7. Ms. Fuisz's duties and responsibilities as Senior Counsel included negotiating public sector contracts, public sector compliance, managing the company's intellectual property portfolio, and product counseling.

8. Ms. Fuisz excelled in her role as Senior Counsel, quickly gaining new responsibilities. In October 2021, less than a year since hiring her, Datadog promoted her to Associate General Counsel, Product and Intellectual Property.

9. In February 2022, Datadog promoted Kerry Acocella from Assistant General Counsel to General Counsel and restructured the legal department, creating the Product &

Intellectual Property legal group. Ms. Fuisz was selected to lead the Intellectual Property group.

10. In May 2022, Datadog assigned Ms. Fuisz responsibility for Datadog's United States Treasury Department Office of Foreign Assets Control (OFAC) screening Datadog and transferred Susan Gricko, a contracts analyst, to the Product and IP Group to work under Ms. Fuisz. Ms. Fuisz continued to excel in the new work.

11. Datadog implemented a new performance feedback metric in the Spring of 2022. In Ms. Fuisz's first review, the evaluator wrote:

> Amanda is an excellent leader and colleague. Her ability to visualize transformation and plan processes is bar none and she pairs that organizational strength with empathy and personality. Her expertise without question and her self-awareness and lack of ego is beyond admirable. She is a tremendous asset to the legal team and the company as a whole.

12. This evaluation made clear that Datadog considered Ms. Fuisz's visual presentations to be an asset to the company, as the graphs and charts she routinely used were filled with the details necessary to convey what she needed to get across.

13. Datadog gave Ms. Fuisz another glowing review in the Fall of 2022. The evaluator wrote that Ms. Fuisz was an "[a]bsolute go-to on the cloud partnerships," a significant portion of Datadog's business, and that the evaluator was impressed with how Ms. Fuisz was handling the new team with significant turnover. The evaluator wrote "I can't ask for much more than that!"

***<u>Ms. Fuisz is a person with a disability.</u>***

14. Ms. Fuisz has Attention Deficit Hyperactivity Disorder (ADHD), which is a permanent medical condition that substantially limits her ability to focus and concentrate.

15. Shortly after her hiring, Ms. Fuisz disclosed her disability to Datadog via a document called "How to Work with Me." At or around that time, she also told her then-mentor,

Ms. Acocella, that she has ADHD.

16. In the "How to Work with me Document." Ms. Fuisz wrote that due to her ADHD, she heavily relies on graphs and charts to organize and present complex information.

17. Management, including Ms. Acocella, knew about this accommodation.

18. Management provided positive feedback on Ms. Fuisz's ability to present complex information through charts and graphs.

19. For example, in April 2022, Amit Agarwal, then the Chief Product Officer responded to Ms. Fuisz's chart containing her analysis and findings of the company's contracts with major cloud service providers – the company's most important vendors - with enthusiastic approval. In response to the email of Ms. Fuisz's analytical chart, he replied, "OMG Amanda! Exactly what we were looking for."

20. Ms. Fuisz also continued to receive praise from Mr. Agarwal for a series of charts evaluating Datadog's cloud service providers as she continued to support cloud service provider negotiations through May of 2023.

21. Similarly, a Vice President of Engineering VP praised the Organizational Chart created by Ms. Fuisz, and asked her for copies of the chart to distribute.

***Ms. Acocella had a history of discriminatory animus towards persons with disabilities***

22. In the summer of 2022, Ms. Gricko disclosed to the Legal Department that she had been diagnosed with autism. In August of 2022, Ms. Gricko took a medical leave of absence.

23. During a compensation review while Ms. Gricko was on leave, Ms. Acocella suggested to Ms. Fuisz that Datadog should "nudge" Ms. Gricko out by offering a below-average compensation adjustment. Coming so shortly after Ms. Gricko disclosed her disability and while she was on medical leave, Ms. Acocella's discriminatory motivation for this suggestion was

obvious.

24. Ms. Fuisz pushed back and advocated for Ms. Gricko, arguing that she was a good employee. Ms. Acocella did not go forward with her plan to nudge Ms. Gricko out of Datadog.

***<u>Ms. Acocella and Datadog discriminated against Ms. Fuisz</u>***

25. In April of 2023, Datadog conducted its biannual Employee Survey. It was supposed to be anonymous.

26. However, on May 16, 2023, during a one-on-one meeting, Ms. Acocella raised comments from the employee survey that she falsely attributed to Ms. Fuisz. Despite Ms. Fuisz telling her that the comments were not hers, Ms. Acocella pressed forward and told Ms. Fuisz that the comments made her question whether Ms. Fuisz was a good fit for the company. Ms. Fuisz objected, stating that she was open to feedback but was uncomfortable with Ms. Acocella leveling this attack based on comments that were supposed to be anonymous and were not hers.

27. The next day, Ms. Acocella issued Ms. Fuisz a written performance review with a score of one out of three, indicating underperforming. As part of the review, Ms. Acocella wrote "while frameworks and charts might be helpful to you to formulate your thinking, they are often overwhelming for a business partner in need (or me as a manager)." This was the first – and would prove to the be only – negative performance review Ms. Fuisz received at Datadog.

28. On May 18, 2023, Ms. Acocella scheduled a meeting with Ms. Fuisz to go over the performance review. Concerned over Ms. Acocella's attacks on her two days prior as well as the discriminatory comments about her graphical presentations in the evaluation, Ms. Fuisz asked to have human resources representative Kate Bergin attend the meeting.

29. During the meeting, Ms. Fuisz asked Ms. Acocella what criteria she used to

measure her performance, since she had not received a negative performance review before. Ms. Acocella suggested that Ms. Fuisz add her to Ms. Fuisz's group meetings and Slack channel, and she and Ms. Fuisz have daily, hour-long meetings.

30. Then, without prompting, Ms. Acocella shouted about Ms. Fuisz's use of charts and graphs, which she knew was related to Ms. Fuisz's ADHD. She yelled, "[j]ust stop with the charts! No more charts!"

31. Ms. Acocella's comments attacking her for her disability aids greatly distressed Ms. Fuisz. Immediately after the meeting, Ms. Fuisz told Ms. Bergin about her ADHD, its relation to her use of charts and graphs to organizing information, and that Ms. Acocella had previously been critical of another employee with a disability, Susan Gricko. Ms. Bergin agreed that Ms. Acocella had not been clear about her expectations for Ms. Fuisz during the meeting but demurred as to the discriminatory comments.

32. Ms. Fuisz followed up via email with Ms. Bergin about Ms. Acocella's comments the next day, May 19, 2023, and Ms. Bergin responded that they could speak the following Monday, May 22, 2023.

33. On May 22, 2023, Ms. Fuisz spoke with Ms. Bergin about Ms. Acocella's discriminatory behavior, and said that Ms. Acocella was creating a hostile work environment based on her disability. Ms. Bergin memorialized this meeting in an email later that day.

34. The next day, May 23, 2023, Ms. Acocella fired Ms. Fuisz, during a phone call with Senior People Business Partner Jeremy Schonzeit. After the call was over, Ms. Fuisz contacted Mr. Schonzeit and asked about the status of her complaints about Ms. Acocella's discriminatory behavior. Mr. Schonzeit replied that that was Ms. Bergin's responsibility. Upon information and belief, neither Ms. Bergin nor anyone else at Datadog ever investigated Ms.

Acocella's discriminatory comments.

35. Based upon Ms. Acocella's history of discriminatory animus towards persons with disabilities as well as her comments in the days leading up to her terminating Ms. Fuisz's employment, the reason for Ms. Fuisz's termination is clear: Ms. Acocella fired Ms. Fuisz because she has a disability and complained of disability discrimination.

## COUNT I

Violation of D.C. Code § 2-1402(a)(A)(1)
Discriminatory Discharge

36. Ms. Fuisz re-alleges and re-incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

37. At all times relevant to this Complaint, Plaintiff was a person with a disability within the meaning of D.C. Code § 2-1402(a)(A)(1).

38. At all times relevant to this Complaint, Defendant Datadog was an employer within the meaning of the DCHRA, as it employed Plaintiff who worked primarily from her home in the District of Columbia.

39. The DCHRA prohibits employers from discriminating against an employee on the basis of disability.

40. Defendant subjected its employee to discrimination when, through its agent and employee Kerry Acocella, it belittled and demeaned Plaintiff's use of charts and graphs to compensate for her disability and then terminated her employment because of her disability.

41. By and through this conduct, Defendant violated the DCHRA.

42. Defendant's unlawful conduct was done with evil motive, actual malice, and in willful disregard of Ms. Fuisz's rights.

43. As a direct and proximate result of Datadog's unlawful conduct, Ms. Fuisz has

suffered and continues to suffer loss of pay, career damage, physical pain, emotional distress, mental anguish, and other economic and pecuniary losses.

**COUNT II**
Violation of D.C. Code § 2-1402(a)(A)(1)
Retaliatory Discharge

44. Plaintiff re-alleges and re-incorporates by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

45. At all times relevant to this Complaint, Plaintiff was a person with a disability within the meaning of the DCHRA.

46. At all times relevant to this Complaint, Defendant Datadog was an employer within the meaning of the DCHRA, as it employed Plaintiff who worked primarily from her home in the District of Columbia.

47. Ms. Fuisz engaged in protected activity when she complained to Ms. Acocella about Ms. Acocella's discriminatory comments to her about her disability and when she complained to Datadog's human resources department about Ms. Acocella's discriminatory comments about her disability, on or about May 19 and 22, 2023.

48. Defendant Datadog took adverse action against Ms. Fuisz when it terminated her employment on May 23, 2023.

49. Defendant Datadog terminated Ms. Fuisz's employment for engaging in protected activity.

50. By and through its conduct, Defendant Datadog retaliated against Ms. Fuisz in violation of the DCHRA

51. Defendant's unlawful conduct was done with evil motive, actual malice, and in willful disregard of Ms. Fuisz's rights.

52. As a direct and proximate result of Datadog's unlawful conduct, Ms. Fuisz has suffered and continues to suffer loss of pay, career damage, physical pain, emotional distress, mental anguish, and other economic and pecuniary losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendant and award Plaintiff compensatory damages in the amount of $1,000,000.00, or such other amount as determined by the jury; lost wages and benefits; back pay; front pay; punitive damages; interest; the amount of tax on any award; costs; reasonable attorney's fees; and such other relief the Court may deem proper.

Dated: April 23, 2024

Respectfully submitted,

ALAN LESCHT AND ASSOCIATES, P.C.

_/s/ David W. Blum___________________
David W. Blum (Bar No.1029697)
1825 K Street, NW, Suite 750
Washington, DC, 20006
Tel (202) 463-6036
david.blum@leschtlaw.com

*Attorney for Plaintiff*